# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UPU INDUSTRIES, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>TOTAL PETROCHEMICALS & REFINING USA, INC.,<br><br>  Defendant. | Case No. 15-CV-2284-JAR-KGG |

## MEMORANDUM AND ORDER

Plaintiff UPU Industries, Inc. ("UPU") brings this action against Defendant Total Petrochemicals & Refining USA, Inc. ("TPRI"), alleging breach of an implied warranty of fitness for a particular purpose with regards to two lots of polyethylene resin that TPRI delivered to UPU in February and March 2014. This matter comes before the Court on TPRI's Motion for Summary Judgment on Plaintiff's Claim (Doc. 60). The motion is fully briefed and the Court is prepared to rule. For the reasons explained more fully below, the Court denies TPRI's motion for summary judgment.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such

---

[1] Fed. R. Civ. P. 56(a).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

1

that a reasonable jury could return a verdict for the non-moving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6] In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9] *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

nonmovant."[10] In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[12]

## II. UNCONTROVERTED FACTS

The following material facts are uncontroverted, stipulated to for the purposes of summary judgment, or viewed in the light most favorable to UPU.

TPRI produces a high density polyethylene resin ("HDPE") identified as HDPE 7195. UPU produces bale netting using HDPE 7195 by "cutting the HDPE film into slit tape or slitting it into tapes." At least some other manufacturers create bale netting by cutting HDPE film into slit tapes, but there are other processes for making bale netting.

### UPU Officers

Todd Whitlock, the Production Superintendent for UPU, is responsible for the blown film extruders, which are the machines that cut the HDPE film into individual tapes. Plastic resin extruders like those run by UPU can be attached to various kinds of machines, such as mold machines, blow mold machines, and casting machines. UPU's extruders are attached to a blown film process. Every blown film line is different.

Philip Orr, CEO and President of UPU, was in charge of purchasing HDPE resin for UPU at all times relevant to this matter. Mr. Orr has been in the "net wrap" business since the 1980s. Mr. Orr and his father were knowledgeable about running a net wrap manufacturing facility

---

[10] *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[11] *Adler*, 144 at 671.

[12] *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

when they started UPU Limited in the United Kingdom based on their experience as importers, distributors, and resellers of net wrap in the agricultural field.

Kevin Rodgers is the Plant Manager for UPU.

## Contracting for HDPE

When Mr. Orr deals with resin suppliers, he explains generally what he is trying to achieve and then asks for recommendations as to what grade material they think will work. Mr. Orr states that he does this because the resin suppliers "don't provide a specification for me to even look at or make a half-guess."[13] When purchasing HDPE, Mr. Orr tells resin suppliers that UPU uses blown film extrusion systems and Karl Mayer knitting machines to make bale netting, and the weight, extension, and elongation of UPU's material. Mr. Orr does not believe there is anything more that the suppliers need to know.

UPU determined that TPRI was the only entity in the United States making the grade of HDPE that UPU could use. UPU searched other companies' data sheets and determined that their grades of HDPE did not have the necessary density and melt flow index—the two factors that UPU determined commonly indicate its "processability" and the relative weight of the end product. UPU purchased HDPE from TPRI beginning in 2005 and continuing through 2014.

At least in 2012, TPRI selected lots of HDPE for UPU to use. At some point in time TPRI changed the name of the resin it supplied to UPU from 7194 to 7195. HDPE 7194 is a medical grade resin. HDPE 7195 is a textile grade resin that has several different applications. TPRI has an internal product specification for HDPE 7195, which specifies the gel count for that resin.

---

[13]Orr Dep. 69:13-24, Ex. B to Pl.'s Resp.

TPRI provides a Data Sheet to buyers for its resins, including HDPE 7195. The Data Sheet for HDPE 7195 states that the product is an extrusion resin and sets forth the resin properties for HDPE 7195, including the Melt Flow Index, Density, and Melting Point. The Data Sheet also sets forth the Mechanical Properties, Characteristics, and Applications for HDPE 7195. According to TPRI's Data Sheet, the Applications for which HDPE 7195 are used are "Monofilament, Slit Tape, Woven and Knitted Fabrics and Specialty Films." The Data Sheet also sets forth the Resin Properties and Mechanical Properties of the resin, including their "Typical Value," and advises that the data is "not to be used as a specification, maxima or minima" and "may deviate from molded and extruded specimens." The Data Sheet does not contain any information regarding gel counts or unmelt counts.

Before UPU began using HDPE 7195, UPU reviewed the HDPE Data Sheet. The Data Sheet for HDPE 7195 either came with the boxes of HDPE when it was delivered for testing, or when it was purchased and delivered. When looking at a data sheet for a product, Mr. Orr "can understand it to the point of knowing it will fit [UPU's] finished product specs or not or if it even has a chance."

TPRI assumed that UPU needed resin to make bale-net wrap, that UPU's process was the same from one day to the next, that UPU was trying to eliminate variables so it could produce the same product each time, and that UPU wanted to receive the same product from TPRI to repeatedly produce the same product. Before sending products to customers, TPRI engaged in internal QC testing to ensure that the gel count in the material met certain internal product specifications, which TPRI did not disclose to UPU. As far back as 2008, TPRI told UPU that TPRI could not determine whether a lot of HDPE would or would not work for UPU until UPU actually ran the resin.

**Testing**

Before purchasing resin to use in UPU's manufacturing facility, UPU ran the product through its own testing process. UPU ran trials on the HDPE resin to ensure that UPU could use the resin to make its products. UPU conducts a melt-flow index test before accepting shipments of resin from TPRI to confirm that the shipment conforms to the melt-flow number reported by TPRI. UPU's melt-flow index test was a precautionary test to ensure that the polyethylene resin TPRI supplied was in fact polyethylene resin, and not some other kind of plastic resin. There is no relationship between melt-flow index and gel count, and UPU did not test whether the resin was capable of producing gel- or unmelt-free film.

UPU spent about one week testing resin in its manufacturing facility before determining whether the resin would work in UPU's production process. Thereafter, the finished products were tested in the field. UPU received about 5 or 6 tons of HDPE from TPRI to test to see if it would work for UPU. In testing the HDPE and running it through UPU's machine, UPU was able to look at the parameters of the raw material and determine the tensile strength and elongation of the finished product.

**Issues with HDPE Resin**

UPU had production problems with gels in the film of the HDPE from 2008 through 2014. The big factor for UPU with a high gel-count problem is the run time, because gels stop UPU's manufacturing process. Gels stop the knitting machines. Gels cause the individual tapes of plastic film to break as they run through the knitting machine. Each time a tape breaks, the machine must stop for the operator to tie the broken ends of the tape back together and restart the machine.

UPU cannot test for gels and does not know what a normal gel count for TPRI's resin would be. The data sheet for HDPE 7195 does not include information about gel count, but TPRI's internal specifications for some grades of HDPE do include a gel count specification. TPRI does not provide gel count information to customers like UPU.

In 2012, TPRI advised UPU that two problem lots of HDPE 7194 sent to UPU were prime and met all of TPRI's QC requirements and that TPRI was unable to make any determination as to lots of HDPE 7194 that would perform well at UPU's facility and lots that would not. In 2012, TPRI also told UPU that there was nothing wrong with the lots of HDPE that TPRI supplied to UPU, even though TPRI cited "differences" it observed at UPU's factory in its reports. TPRI was never able to provide UPU with a conclusion as to why some lots of HDPE 7195 worked well for UPU in its processing system and other lots did not.

In June 2014, TPRI sent employees to UPU's facility to troubleshoot the issues with HDPE 7195. During that trip, the TPRI employees had full control over UPU's extrusion process, suggesting changes to the process which UPU personnel implemented. With control over UPU's extrusion facility, the TPRI employees could not make the HDPE 7195 resin run. The TPRI employees called one of the lots of HDPE 7195 that it had identified and shipped to UPU "terrible," with "bad gels."

### III. DISCUSSION

UPU alleges that TPRI breached an implied warranty of fitness for a particular purpose with respect to two lots of HDPE 7195 that the parties contracted for and TPRI furnished to UPU in February and March 2014. An implied warranty of fitness for a particular purpose exists "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or

furnish suitable goods."[14] Whether or not an implied warranty of fitness for a particular purpose arises in any individual case is a question of fact to be determined by the circumstances of the contracting.[15] TPRI argues for summary judgment in its favor because UPU has not presented evidence that would create a genuine dispute of fact as to whether an implied warranty of fitness for a particular purpose existed in relation to these two lots of HDPE 7195. Specifically, TPRI argues that UPU has failed to present any evidence that (1) it intended to use the HDPE 7195 for a particular—as opposed to ordinary—purpose; and (2) it relied on TPRI's skill and expertise in choosing among goods to meet that purpose. The Court addresses each argument in turn.

### A. Particular Purpose

A defining characteristic of the implied warranty of fitness for a particular purpose is that the goods contracted for are used for a particular, rather than ordinary, purpose.[16] The warranty of fitness for a particular purpose is frequently confused with the implied warranty of merchantability, which covers fitness for ordinary purposes.[17] But "[t]he warranty of fitness for a particular purpose is narrower, more specific, and more precise."[18] Thus, "[w]hen goods are acquired for the *ordinary purposes* for which such goods are generally used, no implied warranty of fitness for a *particular purpose* arises. A use for ordinary purposes falls within the concept of merchantability."[19] The comments to K.S.A. § 84-2-315 provide the following guidance as to this element of an implied warranty of fitness for a particular purpose:

---

[14]K.S.A. § 84-2-315; *Golden v. Den-Mat Corp.*, 276 P.3d 773, 799 (Kan. Ct. App. 2012); *CB Lodging, LLC v. i3tel, LLC*, No. 08-2310-JAR, 2008 WL 4717092, at *3 (D. Kan. Oct. 20, 2008).

[15]K.S.A. § 84-2-315, cmt. 1; *see CB Lodging*, 2008 WL 4717092, at *3.

[16]*E.g.*, *Smith v. Stewart*, 667 P.2d 358, 361–62 (Kan. 1983) (citations omitted).

[17]*Int'l Petroleum Servs., Inc. v. S & N Well Serv., Inc.*, 639 P.2d 29, 37 (Kan. 1982).

[18]*Id.*

[19]*Stover v. Eagle Prod., Inc.*, 896 F. Supp. 1085, 1091 (D. Kan. 1995) (citing *Smith v. Stewart*, 667 P.2d 358, 362 (Kan. 1983)) (emphasis in original).

8

A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.[20]

Thus, for an implied warranty of fitness for a particular purpose to arise, the goods must be used for a particular purpose, and the seller must have reason to know of the buyer's particular purpose for the goods.[21] The buyer, however, "need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists."[22] "Whether the parties engaged in communication or otherwise created an implied warranty of fitness for a particular purpose in a given transaction typically presents a jury question."[23]

Several examples help illustrate the line between particular and ordinary purposes. In *Stover v. Eagle Products, Inc.*, Judge Crow granted summary judgment in favor of the defendant dog food manufacturer because "using dog food to feed dogs is the ordinary purpose of the product."[24] Similarly, the Kansas Supreme Court in *Smith v. Stewart* affirmed dismissal of an implied warranty of fitness claim, where the plaintiff purchased a boat to use "as a pleasure craft on an inland lake."[25] The court found that "such usage is well within the ordinary purpose of such goods," and that the plaintiff had not alleged that his usage of the boat was for a particular

---

[20]K.S.A. § 84-2-315, cmt. 2.

[21]*Danaher v. Wild Oats Mkts., Inc.*, No. 08-2293-DJW, 2011 WL 2969314, at *4 (D. Kan. July 20, 2011).

[22]K.S.A. § 84-2-315, cmt. 1; *Golden v. Den-Mat Corp.*, 276 P.3d 773, 799 (Kan. Ct. App. 2012).

[23]*Golden*, 276 P.3d at 799.

[24]896 F. Supp. 1085, 1091 (D. Kan. 1995).

[25]667 P.2d 358, 362 (Kan. 1983).

9

purpose as opposed to an ordinary purpose.[26] Additionally, the Kansas Supreme Court in *International Petroleum Services, Inc. v. S & N Well Service, Inc.* found that no implied warranty of fitness for a particular purpose arose because the oil well equipment at issue was used for an ordinary purpose.[27] The court explained, "[i]n our present case the buyer's intended use of this equipment in his business was no different than the use of the equipment in any oil well servicing business. No specific use by the defendant buyer was envisaged which was peculiar to the nature of his business."[28]

By contrast, in *Golden v. Den-Mat Corporation*, the plaintiff purchased dental veneers for the purpose of obtaining "strikingly white teeth," as opposed to "simply some cosmetic improvement in the appearance of her teeth."[29] On this basis, the Kansas Court of Appeals found that the plaintiff had presented sufficient evidence of a particular purpose to avoid summary judgment on her implied warranty of fitness claim.[30] Finally, in *CB Lodging, LLC v. i3tel, LLC*, the plaintiff alleged that it sought and accepted a proposal for the installation of a voice over internet protocol system ("VOIP") that would conform to certain specifications and would be "capable of interfacing with a uniquely standardized network."[31] Because the plaintiff alleged that the defendant had reason to know that the plaintiff required the VOIP system to satisfy unique specifications, this Court found that the plaintiff had alleged a particular purpose for the system.[32]

---

[26]*Id.*

[27]639 P.2d 29, 37 (Kan. 1982).

[28]*Id.*

[29]276 P.3d 773, 799 (Kan. Ct. App. 2012).

[30]*Id.*

[31]No. 08-2310-JAR, 2008 WL 4717092, at *3 (D. Kan. Oct. 20, 2008).

[32]*Id.*

TPRI argues that UPU has presented no evidence of a particular purpose. Specifically, TPRI asserts that UPU has not presented any evidence as to the circumstances of contracting for the HDPE 7195 it purchased in February and March 2014. TPRI also argues that the evidence here demonstrates beyond dispute that Plaintiff used the HDPE 7195 for an ordinary purpose. TPRI points to uncontroverted evidence that the data sheet for HDPE 7195 referred to "slit tape" as one of the "Applications" for the resin. TPRI emphasizes that UPU uses HDPE 7195 for precisely this purpose, that is, making bale netting by slitting tapes of HDPE film. Additionally, TPRI notes that other manufacturers use the same slit-tape process to make bale netting. UPU responds that it uses HDPE 7195 to make bale netting through a particular set up of "blown film extrusion systems and Karl Mayer knitting machines," and that it creates netting with unique weight, extension, and elongation characteristics. UPU contends that TPRI knew UPU was trying to create the same product repeatedly, and that it needed a consistent product to achieve that purpose.

The evidence is uncontroverted that UPU used HDPE 7195 to make bale netting by slitting plastic film into tapes, which is one of the "Applications" of HDPE 7195 and a process that other manufacturers use. Thus, at first blush it appears that UPU unquestionably purchased HDPE 7195 for an ordinary purpose. But UPU has presented evidence that it was using a particular set up of blown film extrusion systems, and that every blown film system set up is different. Additionally, UPU conveyed particular characteristics of its bale netting to TPRI, and also conveyed that it needed a consistent product to achieve its goals.

Although TPRI contends that UPU has not presented any evidence of the circumstances of contracting for the HDPE 7195 it purchased in February and March 2014, the record reflects that UPU conveyed to resin suppliers that it was using the resin to manufacture bale netting with

11

certain characteristics by slitting HDPE film into tapes through a process of using blown film extrusion systems and Karl Mayer knitting machines. It is reasonable to assume that UPU conveyed the same manufacturing processes and bale netting characteristics to TPRI during the course of the parties' contracting, and that UPU also communicated that it needed a consistent product to repeatedly manufacture bale netting.[33] Given that the parties continuously contracted for HDPE resin beginning in 2005, it is also reasonable to infer based on these circumstances that UPU was planning to use the HDPE 7195 it purchased in February and March 2014 to create bale netting using the same processes and resulting in the same characteristics it previously conveyed to TPRI, and that TPRI had reason to know of these processes and characteristics at the time of the 2014 contracts.[34]

UPU's evidence demonstrates that although it used HDPE 7195 to create bale netting by slitting tapes, in accordance with one of the "Applications" described on the product's Data Sheet, UPU used a particular set up of its machines, created bale netting with characteristics that were unique to its manufacturing process, and conveyed to TPRI that it needed a consistent grade of resin. Thus, the summary judgment record reflects that UPU's purpose in using HDPE 7195 to make slit-tape bale netting was generally ordinary, but that the ultimate product and process were particular to its use. Unlike the buyer in *International Petroleum*, UPU has presented

---

[33]Indeed, TPRI cites to testimony of Mr. Orr explaining that UPU tells resin suppliers it uses blown film extrusion systems and Karl Mayer knitting machines, and also tells suppliers the weight, extension, and elongation of the bale netting. TPRI cites to this testimony to establish the purpose UPU conveyed to TPRI in the course of purchasing the HDPE in 2014. *See* Doc. 69 at 19–20.

[34]*See id.*; *see also CB Lodging, LLC v. i3tel, LLC*, No. 08-2310-JAR, 2008 WL 4717092, at *3 (D. Kan. Oct. 20, 2008) (explaining that circumstances alleged demonstrated that "at the time of contracting, [the seller] had reason to know" of the buyer's particular purpose in purchasing the goods).

evidence that its use of HDPE 7195 was different in at least some ways from other manufacturers of bale netting.[35]

On the record before it, the Court is unable to determine whether these differences are material for purposes of whether HDPE 7195 was used for its ordinary purpose in this instance.[36] Drawing all reasonable inferences in favor of UPU, it is entirely foreseeable that the differences in UPU's manufacturing processes and the variances in its ultimate product from those of other manufacturers meant that UPU was using HDPE 7195 in a particular, non-ordinary way. Accordingly, the Court finds that a genuine dispute of fact exists as to whether UPU used HDPE 7195 for a particular purpose.

### B. Reliance on Seller's Skill or Judgment to Select Goods

TPRI also argues that UPU has failed to present evidence that it relied on TPRI's skill or expertise to select a particular grade of resin. For a warranty of fitness for a particular purpose to arise out of a transaction, the buyer must rely on the seller's expertise in furnishing goods suitable for the buyer's purpose, and the seller must have reason to know of the buyer's reliance.[37] To satisfy this requirement, the buyer most show that it actually relied on the seller's

---

[35]*Int'l Petroleum Servs., Inc. v. S & N Well Serv., Inc.* 639 P.2d 29, 37 (Kan. 1982) (finding that buyer's intended use of the purchased item "was no different than the use of the equipment in any oil well servicing business. No specific use by the defendant buyer was envisaged which was peculiar to the nature of his business"); *see Golden v. Den-Mat Corp.*, 276 P.3d 773, 799 (Kan. Ct. App. 2012) (explaining that an implied warranty of fitness for a particular purpose is "based on a tailored use of the specific goods known to the seller rather than on an ordinary characteristic or suitability common to goods of that general type").

[36]This case involves a more nuanced determination of purpose than that at issue in the case of a consumer purchasing a shoe, dog food, or even a boat. *See* K.S.A. § 84-2-315, cmt. 2; *Stover v. Eagle Prods., Inc.*, 896 F. Supp. 1085, 1091 (D. Kan. 1995); *Smith v. Stewart*, 667 P.2d 358, 362 (Kan. 1983). At issue here is a particular grade of plastic resin that has several applications and was supplied for the purpose of manufacturing a product with particular characteristics through a series of processes.

[37]K.S.A. § 84-2-315; *Danaher v. Wild Oats Markets, Inc.*, No. 08-2293-DJW, 2011 WL 2969314, at *4 (D. Kan. July 20, 2011) (quoting *Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc.*, 477 F. Supp. 2d 1147, 1155 (D. Kan. 2007)).

input.[38] But as with the buyer's communication of its particular purpose, the buyer "need not bring home" or emphasize to the seller the reliance on the seller's skill in choosing among goods to meet that purpose, so long as the seller "reasonably should understand the buyer's special use and reliance."[39] Whether or not these requirements are met are "basically [questions] of fact to be determined by the circumstances of the contracting."[40] Thus, the determination of whether the reliance requirements are met is typically a question for a jury.[41]

TPRI argues that UPU has not come forward with evidence that it relied on TPRI's skill or expertise in selecting a grade of resin, or that TPRI had reason to know of such reliance. TPRI again argues that UPU has not presented evidence of the "circumstances of contracting" for the HDPE 7195 it purchased in 2014. Further, TPRI contends that the record demonstrates UPU did not rely on TPRI's judgment. TPRI emphasizes that it told UPU throughout the parties' contracting relationship that TPRI could not determine whether a given lot of HDPE would work well until UPU actually used the resin, and that TPRI was never able to provide a conclusion as to why some lots of HDPE 7195 worked well for UPU and others did not. TPRI also asserts that the record reflects a lack of reliance in this case based on evidence that UPU tested each lot of HDPE 7195 before it accepted the lots, that Mr. Orr could look at HDPE Data Sheets and understand them "to the point of knowing whether [the HDPE would fit UPU's] finished product specs," and that UPU selected TPRI from among several HDPE suppliers based on UPU's assessment of two "processability" factors.

---

[38]K.S.A. § 84-2-315, cmt. 1; *Golden*, 276 P.3d at 799 (citing *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 657 P.2d 532 (Kan. 1983)).

[39]K.S.A. § 84-2-315, cmt. 1; *Golden*, 276 P.3d at 799 (citing *Circle Land*, 657 P.2d at 532).

[40]K.S.A. § 84-2-315, cmt. 1.

[41]*See Golden*, 276 P.3d at 799 ("As we have noted, whether the parties engaged in communication or otherwise created an implied warranty of fitness for a particular purpose in a given transaction typically presents a jury question.").

UPU responds that although it could use the Data Sheet to determine whether the HDPE would meet the density and melt-flow characteristics it needed to produce its bale netting, it could not determine what grade of HDPE had an optimal gel count for its manufacturing process. UPU points to evidence that it was unaware of the gel count information for HDPE 7195, and that only TPRI had access to this information through its internal product specification. UPU also highlights Mr. Orr's testimony that because resin suppliers did not provide these specifications in their data sheets, he would ask for recommendations as to the grade of material that they believed would work. Additionally, UPU asserts that it provided information regarding its manufacturing processes and the characteristics of the bale netting it produced, and that TPRI selected Lots of HDPE for its use.

As an initial matter, the Court is not persuaded that the record lacks evidence regarding the "circumstances of contracting" for the HDPE 7195 UPU purchased in 2014. UPU has presented evidence regarding its communications with TPRI and problems with gels in the HDPE film throughout UPU and TPRI's contracting relationship. The parties' communications throughout the course of their relationship bear heavily on the circumstances under which the parties executed the contracts for the shipments of HDPE in February and March 2014, as well as whether TPRI had reason to know of any reliance on UPU's part.[42]

The Court finds that genuine issues of fact remain as to whether UPU relied on TPRI's skill and expertise to select grades of HDPE for its use. The record plainly reflects that UPU could determine whether the density or melt-flow characteristics would meet its production specifications by looking at a data sheet for a particular lot of HDPE. Indeed, UPU concedes that it engaged in testing to ensure that the HDPE 7195 would work in its production process

---

[42] *See supra* Part III.A. at 11–12.

before it accepted batches of resin from TPRI. TPRI asserts that these facts show it was UPU—not TPRI—that had the expertise and skill to determine whether the HDPE would work in its manufacturing process. The Court recognizes that if density and melt-flow index were the only variables that affected the selection of the grade of HDPE supplied to UPU, that would be the end of the story. UPU clearly had the information, means, and expertise to ensure that the grade of HDPE it received complied with its production requirements with regard to these two variables. In fact, UPU determined HDPE suppliers other than TPRI could not meet its requirements as to density and melt-flow index, and Mr. Orr testified that these two factors commonly indicate HDPE "processability."

But the Court cannot ignore UPU's evidence as to a third factor—gel count—that UPU asserts was determinative of the grade of HDPE it received from TPRI. The record is clear that only TPRI knew the gel count specification for a given lot of HDPE, and that only TPRI could test the HDPE to ensure that it met this specification. Thus, if gel count was a factor in determining which grade of HDPE UPU received, it follows that UPU would have to rely on TPRI to supply a resin with an appropriate gel count. UPU has presented evidence that TPRI knew that it was attempting to "eliminate variables" and wanted to produce a consistent product, that TPRI tested HDPE to determine whether it met gel count specifications before sending the resin to UPU, that UPU generally asked resin suppliers for recommendations on the grade of resin because suppliers did not provide "specifications," and that gel count issues were a factor in the "run time" of UPU's manufacturing process. This evidence suggests that although density and melt-flow index were typically the factors that UPU used to determine the "processability"

of HDPE, gel count was also an important factor.[43]  Additionally, UPU has presented evidence that TPRI selected which Lots of HDPE to send to UPU at least in 2012.

Drawing all inferences in favor of UPU as the nonmovant, this evidence suggests that gel count may have been a factor in determining which grades of HDPE UPU received, and that TPRI selected which grades of HDPE to send to UPU.  Although TPRI has presented evidence that UPU selected TPRI as a resin supplier based on density and melt-flow factors, TPRI has not presented evidence that UPU selected the specific *grade* of HDPE it received.  In the absence of evidence regarding who chose to send HDPE 7195 to UPU in February and March 2014, a reasonable inference can be drawn from the evidence summarized above that TPRI selected the grade of resin to send to UPU, in part based on the gel count.

TPRI emphasizes two further points throughout its briefings.  First, TPRI points to the fact that it could not determine what grade of HDPE resin would work for UPU before UPU tested it, and that UPU was aware of this fact.[44]  It may be that TPRI could not determine what grade of HDPE would work for UPU until UPU tested the resin.  But TPRI was undoubtedly in a better position to choose from various grades of HDPE based on the gel count factor, even if TPRI could not determine whether that grade of resin would work for UPU until UPU tested it.  Stated differently, it is possible that neither party was in a position to determine whether the chosen grade of HDPE would work well for UPU until UPU ran the resin, but that TPRI was in a better position to select a grade of HDPE with an optimal gel count and UPU relied on TPRI to do so.  UPU has presented sufficient evidence to support this inference.

---

[43]*See Fiberglass Component Prod., Inc. v. Reichhold Chems., Inc.*, 983 F. Supp. 948, 957 (D. Colo. 1997) (denying summary judgment where buyer was an expert in application and use of resins at issue in buyer's production of fiberglass component parts, but where "the expertise in question concerns the low smoke and flammability characteristics of resins, not the application or use of these resins in fiberglass component production. The exhibits before me reveal that [the seller] is an expert in low smoke resins.").

[44]Doc. 61 at 2–3, 15–16; Doc. 69 at 2, 18, 25–26.

Second, TPRI contends that the gel count issue is not material because "information known to TPRI and *unknown* to UPU is immaterial and has no relevance to . . . whether UPU relied on TPRI to select resin for UPU's use."[45] The fact that the gel count specification was unknown to UPU does not mean that UPU did not rely on TPRI to select a grade of resin with an optimal gel count specification. UPU has presented evidence that it told TPRI that it wanted to "eliminate variables" and that it asked resin suppliers for recommendations because UPU did not receive "specifications" from these suppliers. This suggests that UPU understood that the gel count specification was a factor in which grade of HDPE resin to select, but that it did not receive these specifications from resin suppliers. It would make sense that UPU would rely on TPRI to select a grade of HDPE with an ideal gel count specification even though UPU did not know the specific gel count properties of the HDPE with which it was presented. Indeed, it seems that reliance on a seller is especially appropriate where a buyer knows that a given variable is a factor that plays into a choice from among several products, but where the seller has superior knowledge or expertise as to the specific properties of the variable.[46] Here, there is sufficient evidence to create a genuine dispute of fact as to whether UPU knew that the gel count specification was an important factor but relied on TPRI to select a grade of HDPE with an optimal gel count, or whether UPU simply did not consider gel count relevant and therefore did not rely on TPRI to choose a resin with a gel count that would work.

In sum, the record demonstrates that whether UPU relied on TPRI's skill and judgment to select a grade of HDPE with an optimal gel count, and whether TPRI had reason to know of this

---

[45] Doc. 69 at 9–13, 22, 28.

[46] *See Fiberglass Component Prod., Inc.*, 983 F. Supp. at 957 (holding that genuine dispute of fact existed as to buyer's reliance on resin supplier, where evidence existed of supplier's expertise and superior knowledge regarding low smoke and flammability characteristics of resins); 67A Am. Jur. 2d *Sales* § 685 ("Because reliance on the seller's skill and judgment is an essential predicate for the implication of the warranty of fitness for a particular purpose, the seller must have skill and knowledge. Thus, the comparative knowledge of the parties is significant in determining the existence of reliance.").

reliance, are open questions. Certainly, UPU was capable of testing the HDPE to determine whether the density and melt-flow index factors met its requirements. But only TPRI knew the gel count specification for each batch of resin, and UPU was unable to test for this factor or to determine what gel count specification would be acceptable for its purposes. TPRI has presented evidence suggesting that UPU did not consider gel count as a factor in considering which grade of HDPE to purchase. By contrast, UPU has presented evidence suggesting that it knew gel count was an important factor in choosing a grade of HDPE and in the efficiency of its manufacturing process, and that it sought recommendations from resin suppliers because it did not have gel count information. This opposing evidence creates genuine disputes of material facts as to whether UPU relied on TPRI to select a grade of HDPE, and whether TPRI had knowledge of such reliance. This factual dispute should be submitted to a jury.

## IV. CONCLUSION

Although UPU used HDPE 7195 for one of its listed "Applications," the record reflects a factual dispute as to whether the differences between UPU's manufacturing processes and characteristics in the resulting bale netting and other manufacturers constituted a particular purpose. Additionally, UPU has come forward with sufficient evidence to create a factual dispute as to whether UPU, although it was capable of testing HDPE for density and melt-flow index, relied on TPRI to supply a grade of HDPE with an optimal gel count specification. Because genuine disputes of fact exist as to these two material elements of UPU's claim, the Court denies TPRI's motion for summary judgment.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Total Petrochemicals & Refining USA, Inc.'s Motion for Summary Judgment on Plaintiff's Claim (Doc. 60) is **denied**.

**IT IS SO ORDERED.**

Dated: May 5, 2017

                                                         S/ Julie A. Robinson
                                                         JULIE A. ROBINSON
                                                         UNITED STATES DISTRICT JUDGE